WETMORE and others *v.* ST. PAUL & PACIFIC R. Co.

*(Circuit Court, D. Minnesota. June 28, 1880.)*

1. MORTGAGE—FORECLOSURE—IMPEACHING DECREE.—After confirmation of the sale of a railroad under decree of foreclosure, holders of the mortgage bonds will not be allowed, at a subsequent term, to be made parties to the original foreclosure suit, for the purpose of impeaching the decree, sale, and confirmation as fraudulent, although in the order of confirmation the power to make further order is expressly reserved.

The proceedings and sale in this case considered, and *held* free from fraud.

On June 14, 1879, the St. Paul & Pacific Railroad, its land grant, etc., were sold under a decree of the United States circuit court for Minnesota, entered April 11, 1879, in a suit for foreclosure of a trust mortgage, securing bonds to the amount of $15,000,000, and were purchased by a corporation organized by the holders of a large majority of the bonds. On June 21, 1879, the sale was confirmed, and the property delivered to the purchaser, the order of confirmation, however, containing this clause: "This order is made by and with the consent, and at the request of, the trustees, the complainants, and with the consent of the parties defendant, and the right to make any further order is reserved."

After the confirmation, certain bond holders filed a bill in the same court to vacate the decree and sale as fraudulent, which bill was dismissed. See *Kropholler* v. *Kennedy,* 2 FED. REP. 302. Thereupon, the same bond holders and others presented a petition at the June term, 1880, praying that they might be made parties to the original foreclosure suit, and that the decree, sale, and confirmation might be set aside as fraudulent.

This petition was heard before *Miller* and *Nelson,* JJ.

*John M. Gilman* and *C. K. Davis,* for petitioners.

*Geo. B. Young* and *R. B. Galusha, contra.*

MILLER, C. J. *(orally.)* This case, which has been very fully argued before us, and which we have taken into consideration as thoroughly as we are able at this term, is

one of very great importance, considering the sum involved in the controversy. The purpose of the petition is no less than to set aside the sale of a railroad which is perhaps worth $20,000,000, or more; a road which has been reorganized since the purchase, with a new set of directors, a new set of stockholders, very largely and above all, a new set of bond holders. The road was purchased under a decree of this court, the purchase was confirmed, and a new company organized, which has been in possession of the road over a year, and has issued, as I say, some $10,-000,000 or $15,000,000 of new bonds, held all over the world; and now original bond holders in the old company, representing $1,500,000, come and ask that all these proceedings be set aside, and that we proceed *de novo* to sell the road. These petitioners were not parties to that suit in the sense in which they now seek to be made parties. The first thing that they ask in the present proceeding is that they may be made parties. If they were parties at all—as in some sense they were, and represented by their trustees in the proceedings of foreclosure —they were not parties in such a sense as would enable them to control the litigation, or come forward now as parties originally engaged in the litigation; and they, therefore, seek, very properly, if they are to have any relief in this proceeding, to be made parties in the first instance. The first question that presents itself is whether they can be made parties.

Taking all to be true that they say in their petition, the case stands that, during the proceedings of foreclosure, these petitioners ought to have been represented, and were legally represented, by the trustees, plaintiffs in the foreclosure suit. The foreclosure was manfully resisted by the corporation for three or four years. It was obvious that the mortgage ought to be foreclosed, and the road sold, as the interest had not been paid for years. The present applicants state that the road, at that time, was worth say $8,000,000. Fifteen million dollars of bonds were liens upon it, with whatever other claims there may have been against it, besides the interest coupons, so that the road had a bonded debt of twice the amount these petitioners say it was then worth. It was, therefore, obvious

that it was just and right to foreclose the mortgage, and sell the road, for the payment of those debts.

During this litigation it became apparent to the court that this road had to be sold. They finally entered a decree for the sale. It has been said in the argument that that was a consent, and, therefore, was something of an *ex parte* proceeding, but the record does not show any such state of the case as that. It shows very clearly that the parties were present, and although there is, in some parts of the record, a preliminary statement that such and such parties were present in court, and consented to the decree, or submitted a decree which they desired to have entered, the record goes on further to state that the court did not enter that decree, but that it took the paper and entered a decree upon its own consideration. It was, therefore, a decree on a full consideration by the court—one which met its approval, upon an examination of the merits—and it ordered the sale. The sale was had. A part of the original bond holders were, under a special organization, according to the laws of Minnesota, purchasers. That did not settle the controversy or the rights of the parties absolutely. The master who made that sale was required to report it into court. He did report it, and the sale was confirmed.

Now, that sale being confirmed, a deed made by the master, property turned over and delivered to the purchasers, those purchasers having reorganized under another corporate name, doubtless a great deal of the stock that they held passed into the hands of other men—certainly the bonds that they issued upon the strength of that new organization, to the extent of $8,000,000, having passed into the hands of other men—these parties now, for the first time, come into this court and ask that they be permitted to upset all this transaction, to do that which they did not seek in the five years of litigation, namely, to be made parties to this suit, and then to be treated in the double aspect of persons who are parties to the suit and having all the rights of parties from the beginning, and, also, in the aspect of persons who were not

parties to the suit, and whose rights have not been fore-closed.

No authority is shown, no precedent is shown, and I do not believe any can be shown, for such a proceeding. It is so anomalous, so unusual, so much out of the way, that I think it requires express authority in the way of precedent or statute to show that such a thing as that can be done. The counsel, apparently, seeing this difficulty, have made an order accompanying the confirmation proceedings the foundation, to a large extent, of this application. There is a single sentence at the end of the long order concerning the confirmation. The first part of that confirmation is: "That the said report, the said foreclosure sale, and all proceedings thereon, be and the same are, hereby, in all things, confirmed." There are several orders relating to the distribution of the proceeds, and what the master should do with the money, and so on, and then it winds up: "This order is made by and with the consent and at the request of the trustees, the complainants, and with the consent of the parties defendant shown above, and the right to make any further order is reserved."

The argument in favor of opening this case by these petitioners, who are not parties, is that we will permit them to be made parties; that this order is sufficient to open up everything. *First*, that it is sufficient to go back and open up the original decree; but, if not, that it is certainly sufficient to allow the court, upon such representations as they here make, to set aside the order of confirmation, then to set aside the sale, and then to order a resale, or take such steps as may be just to the parties.

The language of that order differs but little from the ordinary language made use of in decrees, to the effect "that further orders may be made upon a footing of this decree;" and I cannot believe that when it was made it was in the contemplation of the court who was confirming this sale that the "further orders" there spoken of was such an order as would set aside the sale. That was the thing they were passing upon. Who has ever heard of a decree which dis-

poses finally of millions of property—a decree under which the purchasers were to take possession and get a final deed, and under which they would enter upon the management of the property and create new rights, by bonds and all that sort of thing—who ever supposed that such a decree as that was to stand for nothing more than a mere preliminary or interlocutory order, which the court could set aside at any time that, in its judgment, sufficient reasons for not confirming the sale should be brought to bear? It is much more in conformity with reason, with precedent, and common sense, to believe that the "further orders" referred to here are such orders as might be necessary for the distribution of the funds as between the parties, and the payment of the bonds which had to come in, and which might be disputed as to their ownership—probably for the delivery of the possession, (for I do not see anything in this decree which requires the delivery of the possession,) probably for the making of a deed, (for I do not see anything here about the making of a deed.) There are fifty things you can imagine which would be consistent with the confirmation of the sale, and which might yet require further orders of the court. I have not the slightest idea that after all the consideration and all the trouble that preceded the sale, and all the parties coming in and agreeing to sell, and consenting to it, that the court simply said: "We confirm this sale, subject to the setting aside of the confirmation whenever we think proper." Such a thing would be plainly against the interests of the purchasers, as well as against the interests of the parties. I therefore think there is nothing whatever in that order which justifies the interference that is asked in this case.

On the whole, then, we are of the opinion that there is no principle or precedent which would warrant these petitioners being made parties to this suit with a view of making such motion in the case.

In the next place we are of opinion that this order is not to be construed as extending to any such relief as is asked by these petitioners.

We perhaps ought to stop there. I understand that a bill

in chancery, in the nature of an original bill, or a bill of review, has been brought in this court, and demurrer thereto sustained by Judge Nelson, which, of course, is subject to appeal.* I feel bound to say that if these parties are entitled to any relief in regard to this transaction it is by some such bill as that, and not by a proceeding to go under the foundation of this suit by being made parties to it, and then seeking to controvert matters which were error in the proceedings. If there has been such fraud practiced upon these parties by their trustees as would justify any relief in connection with that suit, it must be by such a bill as that, whereby they come in and set up their own interest, and show how they were cheated and defrauded. But I must say—I think I have a right to say—perhaps it may be of value in further litigation, (although I would not be bound by it in the supreme court,) that I have not seen such evidences of fraud in this proceeding as to justify the court to set aside this sale.

It seems to me that here was a case of a mutual interest by bond holders and others at hazard, whose purpose and object was to have that road sold to satisfy the bonds. All of them must have desired that the road should be sold to satisfy their debts.

I have already myself decided, on a plea in the original suit concerning the removal of the first trustees, and the substitution of others, that that was rightfully done. Of course, I think so now. The road ought to have been sold. It was the duty of the trustees to procure its sale as soon as possible. They did, with great energy and perseverance, proceed in this court, and finally obtained, after years of litigation, a sale of that property, for the purpose of paying these debts. A sale was had, and it is said that one reason why it should be set aside was that it was sold for an inadequate sum. It was sold for a sum above what the court fixed, as chancery practice calls it, as an "upset price."

Of course, the court, in fixing an upset price, intended to say that it was better that it should sell at that price than not to sell at all, and the court had taken the necessary means to

*See Krophollcr v. Kennedy, 2 FED. REP. 302.

get all the information on the subject possible, as the case stood at that time.   It is wrong to suppose that the same court will now set aside the sale which brings a million and a half of dollars because of the objection that now, in the light of a year or two after that, in the improved circumstances and the prosperous times, in the value attaching to that road growing out of the connections newly made, we are now to consider the thing as of the present time, in relation to its value at the time the same was made.   This is one of those constant every-day events of people, who have let things slip out of their hands, coming back afterwards to endeavor to secure the value which they failed to recognize or secure at the time.   Nothing hindered these bond holders from bidding.   It is said there was a million and a half dollars among them. They could have bid as well as the other bond holders.   The trustees did not feel disposed to fight them; they left them to protect themselves.

I must say, also, in regard to the trustees, that I don't see, although by the decree they had the power, and perhaps a conditional instruction, that they should purchase that property if they thought it was selling for a totally inadequate price, but we cannot say that they did not exercise their best judgment about that when they let it go.   We do know that there were large expenses to be paid; that there was a large sum of money in cash to be paid before it could be bought by the trustees and paid for in the bonds of the corporation. We know that there were a million of dollars of debentures and other interests that had to be provided for before the road could be purchased by the bonds, and we do not know of any adequate means that the trustees had to raise the cash and the amount of these debentures.

I must say, in regard to the argument urged here more than once by Mr. Gilman, that these trustees should have sold the land for that purpose does not strike me as being an argument of very great weight.   They could not have sold land in time to raise that money in any ordinary mode, in any satisfactory mode, in any mode that would not have been liable to greater objections, or as great, as to let the

road be bought in by a majority of the bond holders.    I myself do not see any fraud committed by these trustees.

The great objection, however, is that these bond holders commenced proceedings long ago under the foreclosure proceedings to organize themselves into a body of men by a committee for the purpose of buying the road.   In regard to that it is to be said that they excluded nobody—none of the bond holders—from coming in on the same terms as themselves. They invited every one to come in with them.   These petitioners, representing a million and a half, who now hold these bonds, stood out and declined to come into the arrangement, and took no steps to protect themselves or the property.  What right have they, when these parties spent money, time, and trouble to have this road sold, to claim all the advantages which diligence and labor and money expended; and especially the money for these debentures, in the idea that they were trying to get the road into the hands of a receiver and of keeping it up?   What right have they to come in now and say: "We avail ourselves of your labor, money, and time, for the simple reason that you undertook to get this road sold for the purpose of paying yourselves as well as us?"

Because these men co-operated and put themselves in condition to buy the road, it does not seem to me that they were, therefore, acting in any fraudulent manner.   They deprived these petitioners of none of their rights.   They were at liberty to join the syndicate, as it was called; they were at liberty to bid; they were at liberty to come in and make themselves parties.   They did nothing of the kind.   Were these bond holders, who purchased the road, to be put into the condition of a single man, who owned 12,000,000 out of 15,000,000 of bonds, I can see no reason why they should not take steps to have the road sold, and buy the road as cheap as they could get it, provided they cheated or hindered nobody in the matter.

This branch of the subject was not necessary to be decided here, and the parties may take an appeal from Judge Nelson's decision.   I only make these remarks for the consideration of counsel.

The present petition is overruled.